## PATRICK TUITE *v.* WAKELEE.

PLAINTIFF, on the twenty-ninth of October, 1855, delivered to Rhodes & Whitney—who were running an express from Weaverville, Shasta and other points in the mines, and connecting with the express of Wines & Co., at Sacramento, who ran to San Francisco—"a sealed package of gold dust," consigned to the United States Mint, San Francisco, for coinage, for account of plaintiff.

Tuite *v.* Wakelee.

Rhodes & Whitney transmitted the package to Wines & Co., at Sacramento, who took it to San Francisco and deposited it—Nov. 1st, 1855—at the Mint, the receipt given them at the Mint naming the depositor thus : "Pat. Tuite, G. H. Wines & Co." The Mint certificate of assay, of same date, is headed thus : "No. 10,451. Memorandum of Gold Bullion deposited at the Branch Mint of the United States at San Francisco, the first day of Nov., 1855, by Pat. Tuite." Rhodes & Whitney received this certificate from Wines & Co., and delivered it to plaintiff, taking up their receipt to him. Nov. 6th, 1855, Wines & Co. received the coin from the Mint, per their clerk, who usually made the deposits and drew the coin, the receipt to the Mint being signed— "G. H. Wines & Co., per Pat. Tuite." Wines & Co. received packages from Rhodes & Whitney, and disposed of them according to instructions. No special instructions, in this case, appear on the way-bill book of Rhodes & Whitney. At time of deposit in the Mint, and during the whole transaction, defendant Wakelee was agent of Wines & Co., at San Francisco, the members of the firm being nonresidents. March, 1857, defendant, as agent of Wines & Co., delivered to Rhodes, of the firm of Rhodes & Whitney—which firm was dissolved in December, 1855, Rhodes alone from that time carrying on the Express—a bag of coin containing $1,360.25, marked "Rhodes & Whitney, Weaverville, for acc't of Patrick Tuite." Rhodes then went East and died : *Held*, that neither Wines & Co. nor Rhodes & Whitney had any authority to receive the money from the Mint, their engagement terminating upon the gold being deposited at the Mint; and that, as defendant knew of the terms of this engagement, and hence that in withdrawing the money he was acting beyond the scope of his employment as agent, he is personally liable to plaintiff for money had and received.

APPEAL from the Fourth District.

Action to recover of Wakelee $1,360.34, money had and received by him to plaintiff's use.

The complaint avers, that on the sixth of November, 1855, the defendant received from the U. S. Branch Mint, at San Francisco, the sum of $1,360.34, the property of plaintiff, and received as such by defendant to plaintiff's use, and to be paid on request; that afterwards, on the fifteenth of March, 1860, plaintiff demanded the money of defendant, who refused to pay.

There are two separate defenses set up by the answer. The first is a denial that on the sixth day of November, 1855, or at any other time, the defendant had or received from the said Branch Mint, or any of the officers thereof, the sum of $1,360.34, or any part thereof, as the property of the plaintiff, or to or for his use, or to be paid by the defendant to the plaintiff on request, as alleged in the complaint.

As a second defense, the defendant avers that on the sixth of November, 1855, he was the agent at San Francisco of Wines & Co., an Express company, but was not a member of the firm; that as such agent he received from Jesse Rhodes, of Sacramento, a bag of gold dust, with instructions to cause it to be coined at the Mint, to receive the proceeds from the Mint, and hold the same subject to Rhodes' order; that in pursuance of such instructions, and as such agent, he caused the dust to be coined at the Mint, received the proceeds, and afterwards, in March, 1857, as such agent, and at the request and order of Rhodes, paid the money—$1,360.34—to him, it being the same money mentioned in the complaint; and he denies that he received the money as the property of the plaintiff, or to or for his use, or to be paid to him upon his request; and he avers that it was part of the regular business of Wines & Co., as factors, to receive from Rhodes gold dust to be coined, and to receive and pay over to him the proceeds, and that the defendant, when he received and paid over this money, was the general agent of Wines & Co., at San Francisco, and as such agent had authority, for and in behalf of Wines & Co., to receive and pay over the money to Rhodes.

On the trial, plaintiff proved that Wakelee was the agent of Wines & Co., at San Francisco, and advertised their express in the *Herald;* that on the seventeenth of September and the fifteenth of October, 1855, the advertisement of Wines & Co.'s Express between San Francisco and various other places in the interior and on the coast stated that their express would connect at Sacramento with Rhodes & Whitney's Express between Sacramento and the northern mines; and that the advertisements of Wines & Co.'s Express of the thirtieth of October, sixth, thirteenth and twenty-ninth of November, 1855, did not state that there was any connection between the two companies.

The plaintiff then gave in evidence a memorandum (Exhibit A) which is a copy of the assayer's report mentioned below, filled out and certified:

Tuite *v.* Wakelee.

## EXHIBIT A.

No. 10,451.   MEMORANDUM OF GOLD BULLION DEPOSITED AT THE BRANCH MINT OF THE UNITED STATES,

*At San Francisco, the 1st day of November, 1855, by Pat. Tuite.*

| Description of Bullion. | WEIGHT. | | | | Fineness. | Value of the Gold. | | Silver parted from the Gold. | | | Premium on Silver. per cent. | | Deductions. For parting Coinage and Fine Bars. | | Net Value. | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Before Melting. | | After Melting. | | | | | Fineness. | Value. | | | | | | | |
| | Ounces. | Dec. | Ounces. | Dec. | 1000ths. | Dolls. | Cts | 1000ths. | Dolls. | Cts | Dolls. | Cts | Dolls. | Cts. | Dollars. | Cents. |
| Grains, California. | 76 | 82 | 74 | 69 | 885½ | 1867 | 18 | Silver is offset against Refining Charges. | | | | | 6 | 84 | 1,360 | 34 |

I Certify that the net amount of the above deposit is thirteen hundred and sixty thirty-four one hundredths dollars, payable at the Branch Mint, only on the presentation of the receipt of a corresponding date and number heretofore issued, viz : in Gold Coins, $1360.34 in Gold Bars, $

EDW'D CAHILL, for Treasurer of the Branch Mint.

The plaintiff proved by Edward Cahill, a clerk in the Mint, that this paper was signed by him, and that he had authority to sign it, and that he delivered it to the clerk of the Superintendent of the Mint for him to deliver to the depositor.

Cahill testified that each deposit is delivered to the Receiving Clerk, who weighs it, gives a receipt for it, makes an entry of it in the deposit book, and sends it, with the number, to the Melter and Refiner. The latter, after melting, returns it to the Receiving Clerk, who weighs it and passes it to the Assayer, delivering to him an Assayer's report, filled up with the number and weight of the deposit before melting. The Assayer makes out the weight and fineness and inserts them in the report, and delivers it to the Computing Clerk, who makes the calculations and inserts them in the report, and after copying it in his abstract delivers it to the Superintendent's Clerk.

He testified that he was the Computing Clerk at the time this deposit was made, that this paper (Exhibit A) was a copy of the entry from his book, and that he knew nothing about the name of the depositor, except from the Assayer's report which was furnished to him ; that the name inserted in the receipt given by the Receiving Clerk is continued in subsequent entries, and the same number used ; that the receipt mentioned in Exhibit A is that given by the Receiving Clerk and which has to be returned, and that Exhibit A is a memorandum, not a receipt, and that the money could not be drawn upon it.

The plaintiff then read the deposition of John Anderson, who testified to this effect :

That he knew the firm of Rhodes & Whitney ; in November, 1855, they were engaged in banking and express business in Shasta, Weaverville and other points ; that he was their agent at Weaverville ; that about the twenty-eighth or twenty-ninth of October, 1855, as agent for Rhodes & Whitney, he received from the plaintiff a sealed package of gold dust, containing about $1,306.25, consigned to the U. S. Branch Mint for coinage, for account of Patrick Tuite ; thinks he gave the plaintiff a receipt for it ; it was sent to Rhodes & Whitney at Shasta, and on the thirtieth of October sent by them to San Francisco for coinage. No special instructions ap-

pear on the way-bill book of Rhodes & Whitney. At that time
Wines & Co., at Sacramento and San Francisco, received the
packages of Rhodes & Whitney's Express, and disposed of them
according to instructions; thinks he received from Wines & Co. a
certificate of assay from the Mint, of dust deposited for account of
Patrick Tuite, and that it was delivered to him; and that he knew
the defendant as the acting agent of Wines & Co.'s Express at
San Francisco.

The plaintiff then examined Daniel Crotty, who testified that he
saw the plaintiff receive from Rhodes & Whitney's Express mes-
senger the paper, "Exhibit A," and deliver to him the first paper
he, the plaintiff, got for the amount of dust.

Upon this evidence the plaintiff rested.

The defendant moved for a nonsuit on two grounds: 1st, that
there was no proof that the defendant ever received the money
from the Mint, or had it in his hands; 2d, that there was no privity
of contract shown between the plaintiff and defendant; that on the
contrary, as shown by the plaintiff's evidence, the defendant could
only be liable for the money to Wines & Co., or at most to Rhodes &
Whitney. The motion was overruled and the defendant excepted.

The defendant then called Lafayette Hammond, who testified
that he had been Cashier of the Mint since 1853. He produced
his "book of gold warrants paid." In it was the following entry,
which the defendant gave in evidence:

ENTRY IN "REGISTER OF WARRANTS FOR THE PAYMENT OF
GOLD DEPOSITS."

| (Heading of Page. | Date. | No. | Depositor's Name. | Am't Paid. | Rec'd of the U. S. Branch Mint the sums set opposite to our respective names, in full for Mint Receipts numbered as in the margin. |
|---|---|---|---|---|---|
| *   * (8th line) | *   * 1855 Nov. 6. | *   * 10451 | *   *   *   *   *   * G. H. Wines & Co. Pat. Tuite. | *   * 1360 34 | *   *   *   *   * G. H. Wines & Co. for Pat. Tuite. |

He testified that this entry was an original receipt. That another
original receipt was given, which was sent on to the Department at
Washington; that the duplicate is always required to be sent on as
a voucher for payment; that he paid the money, he thinks, to one

45

Raphael, who was the clerk and representative of Wines & Co. in making deposits and drawing money at the Mint, and took the receipt from him ; that at the time of the payment Raphael delivered to him the original receipt given when he made the deposit; that that receipt is in the Department at Washington ; that it is always required to be sent on ; that it must always be delivered up before payment ; that the receipt given to the depositor is made out from the weight book, which shows the name of the depositor, the description of the bullion, the weight before and after melting, and the number and date of the deposit; and that the receipt given the depositor contains all these items, except the weight after melting, which is inserted in the weight book after the receipt is given.

This witness further testified that deposits made by express companies state the name of the person for whom made, though now, under instructions from Washington, express companies are not allowed to use the names of other persons, and deposits are made by them in their own names.

The defendant then called John C. Mitchell, who was Receiving Clerk of the Mint from July, 1854, to April, 1856, and who stated that it was his duty to receive bullion, enter the name of each depositor, and the weight of the deposit, and deliver him a receipt. He produced his official book showing the deposits, and testified that it was the book of original entries, that the entries were made at their dates, and that the receipts given by him were made *after* the entries in this book, and corresponded in numbers, weights, and names of depositors.

In that book is the following entry made by the Receiving Clerk :

ENTRY IN BOOK OF " DEPOSITS OF GOLD BULLION."

| Heading of Page. | Date. | No. | Name of Depositor. | Weight before melting. | Weight after melting. | Remarks. |
|---|---|---|---|---|---|---|
| (8th line.) | 1855. Nov. 1 | 10451 | Pat. Tuite, G. H. Wines & Co. | 76.82 | 74.69 | Coin. |

Defendant offered this entry in evidence.    Ruled out on the objection of plaintiff, defendant excepting.

The defendant then called Cornelius S. Whitney, who testified that he was a member of the firm of Rhodes & Whitney, in the express and banking business; that they had an office at Weaver-

Tuite *v.* Wakelee.

ville ; that they forwarded their express matter to Wines & Co., at Sacramento, who forwarded it to San Francisco and delivered it according to instructions, which were usually endorsed on the way-bill ; that they paid Wines & Co. by the month ; that they paid Wakelee nothing ; that the firm of Rhodes & Whitney was dis-solved about the middle of December, 1855, and Rhodes then con-tinued to carry on the business in his own name, and had the settle-ment of the business of the firm ; that Rhodes died about June, 1857 ; that Rhodes was in San Francisco about March, 1857, on his way East, and he, the witness, saw Wakelee hand Rhodes a bag of coin, which from its size might contain from $1,000 to $1,500, and take Rhodes' receipt; that Rhodes never returned to California ; that the firm of Wines & Co. was composed of G. H. Wines and —— Whitney, both of New York, and Wakelee was their agent in San Francisco.

The witness proved the signature of Rhodes to a receipt in these words:   "Received, San Francisco, March 17th, 1857, from G. H. Wines & Co., one bag coin containing thirteen hundred and sixty twenty-five one-hundredths dollars, marked Rhodes & Whitney, Weaverville, for acc't of Patrick Tuite.

"$1360 25-100.          (Signed.)         JESSE RHODES."

Defendant then offered this receipt in evidence.   The plaintiff objected to its admission on the ground that "it was incompetent evidence."   Objection sustained, and the defendant excepted.

The defendant then read the deposition of Wm. R. Garrison, proving that Wakelee was the agent only of Wines & Co., and not a partner, and that the firm was composed of G. H. Wines and —— Whitney, of New York, and no others.

The foregoing sets forth substantially all the evidence on both sides.

The defendant asked the Court to instruct the jury that there was no privity of contract between the plaintiff and defendant, and that the plaintiff could not recover in the action.

The Court refused the instruction and the defendant excepted.

The jury then found a verdict for the plaintiff for the amount claimed in the complaint.

The defendant moved for a new trial on the following grounds :

1st. Insufficiency of the evidence to justify the verdict.    2d. That the verdict is against law.    3d. Errors in law occurring at the trial.    New trial denied, and defendant appeals.

*Crockett & Crittenden,* for Appellant.

1. The Court erred in not granting a new trial on the defendant's motion.

2. The Court erred in admitting in evidence the certificate " Exhibit A," there being better evidence to prove who made the deposit.

3. The Court erred in refusing to admit in evidence the entry from the " weight book " or " deposit book " to prove by whom the money was deposited.

It was an original entry, in a public book, required by law to be kept by a public officer, and the entry was made by him in the course of his official duty.    It was therefore admissible.    (Acts of Congress, 1851–2, 11, 12, 13; Id. 1857, Stat. at Large, 137 to 142; 1 Greenl. on Ev., secs. 115, 483, 484, 496.)

4. The Court erred in refusing to admit the receipt of Rhodes to prove the payment by Wines & Co.    If not admissible as original, it was as secondary evidence.    (1 Greenl. on Ev., secs. 181, 120, 147.)

5. Upon the facts, about which there is no dispute, the plaintiff has no cause of action.    There is no privity of contract between plaintiff and defendant, and even if the defendant is to be considered as having received the money as agent of Wines & Co., he could not be responsible as principal to the plaintiff, unless it were alleged and shown that he still had the money, or that notice had been given him to retain it.    (Phil. Ev. 118; Dunlap's Paley's Agency, 388 to 392.)

6. But the defendant never had the money subject to his own disposition and to be paid over to Wines & Co.    It passed directly from the Mint to Wines & Co., and the plaintiff must look to them and not to this defendant.

*Tod Robinson,* also for Appellant.

The money for which the appellant was sued was paid or returned by him to the person from whom he received it.    Under ordinary circumstances, if a bailee restores the deposit to the bailor

which was placed in his hands for safe keeping, he has discharged all the obligation arising from the contract of bailment.   To take this case out of the operation of this rule, it must be shown affirmatively that Rhodes, or Rhodes and Whitney were special agents or bailees of the respondent, who had no authority save to transmit the funds to San Francisco, and when they had arrived safely at the Mint, that then their authority ceased ; that they had no authority to draw the funds, after coinage, from the Mint, and return them to the owner, and that of these facts this appellant had full notice. The only circumstance which the respondent produces to establish this latter fact is, that the package of dust was marked with the name of Patrick Tuite.   It is conceded that if it were shown that Rhodes and Whitney were only common carriers, and were never dealers in gold dust on their own account, that the presumption would fairly arise that the package marked with the name of Tuite was not the property of the carrier, but that it belonged to the person whose name was thus endorsed on it.   But even this presumption here fails, for it is shown that Rhodes and Whitney were bankers and dealers in gold dust, as well as expressmen and the carriers of gold dust.   But admitting that there were facts and circumstances shown in this case sufficient to notify the appellant in the common course of trade, and of his dealings with Rhodes and Whitney, that the gold dust was not the property of Rhodes and Whitney, but that Tuite was the owner thereof; it is further necessary for the respondent to show, to enable him to recover herein, that the duty of an expressman is confined to the deposit of the gold dust in the Mint, and that under no circumstances are they authorized by the original contract of bailment to withdraw the same from the Mint after coinage, and to return it in its new form to their constituents in the mines.   If it were shown that Rhodes and Whitney had no interest in this dust, except as carriers, and that the usage of trade is that the dust conveyed by expressmen was to be deposited in the Mint, in the name and to the credit of the owner, and could only be withdrawn by him, without other and further instructions or authorization to the expressman, then this usage and custom of trade would have stood in lieu of notice, or rather it would be notice to the appellant of the relations which

existed between Rhodes and Whitney and the respondent, touching this particular bailment.    But no such facts, or customs, or usages of trade, are established by the evidence, nor can the Court judicially know of such rules or customs, for none such exist.    On the contrary, the fact is that the principal part of the business of expressmen consists in carrying the gold dust and then returning the coin therefor to their employers.    Business men in the mining regions receive from their customers principally dust, which is transmitted to the Mint, and to be returned immediately in the shape of coin, to be employed again in buying gold dust, or to be used for any other purposes of business.    That such is a very common and usual rule of the carrying business with the mining community, is rendered obvious from the testimony in this case. The witnesses from the Mint, who were examined by appellant, state that it is usual for expressmen to make deposits of gold dust in their own names, and that by the regulation of the Mint now it is the only method in which the deposit can be made.    This is done on the part of the expressmen to enable them to withdraw the coin for the gold dust, without producing an authority from the owner to withdraw it.    It is a custom which has grown up under the course of trade before referred to, which facilitates the expressman and owner in carrying out the objects and purposes of the transactions.

If for no other reason, then, than because no such custom was shown as alone would authorize this judgment, the Court should remand this cause for new trial.

*B. S. Brooks*, for Respondent.

I.   Whenever one man receives the money of another which he has no right to retain, the law implies that he receives it to and for the use of the owner, and to be paid to him on his request.    There need be no privity of contract between the parties in order to support this action, except that which results from one man having another's money which he has not a right conscientiously to retain. (*Mason* v. *White*, 17 Mass. 563 ; *Hall* v. *Marston*, Id. 576 ; *Eagle Bank* v. *Smith*, 5 Conn. 71 ; *Dickson* v. *Cunningham*, Mart. & Yerger, 221 ; *Towne* v. *Hanlon*, 10 S. & R. 219 ; *Bogart* v. *Nevins*, 6 Id. 367 ; *Morris* v. *Tarin*, 1 Dall, 148 ; *Barr*

v. *Craig*, 2 Id. 134; *Murphy* v. *Barron*, 1 Har. & Gil. 258; *Wiseman* v. *Lyman*, 7 Mass. 288; *Might* v. *Butler*, 6 Wend. 290; *Eddy* v. *Smith*, 13 Id. 488; *Guthrie* v. *Hyatt*, 1 Harring. 447; *Farmers' Bank* v. *Brown*, Id. 340; *Tevis* v. *Brown*, 5 J. J. Marsh, 175.)

II.   It is said that "the Court erred in admitting in evidence the certificate ' Exhibit A,' there being better evidence to prove who made the deposit."

1. The Mint memorandum (Exhibit A) is not secondary evidence. It is an original document, issued by a public officer, delivered by the Mint to the depositor as an authentic statement of the weight and value of his deposit, and it is not a copy of anything. No book was produced or proved to exist which contained any record like it. It was the summary of all the entries in all the books.

2. But it was admissible in evidence on another ground. The two expresses operated in connection, and advertised to do business in that way. John Anderson was in fact agent at Weaverville, and Wakelee, the defendant, at San Francisco, for both expresses, as to all packages sent from Weaverville to San Francisco. When John Anderson received the dust from the plaintiff, and contracted for the transportation of the dust to the Mint and the deposit of it there for coinage for account of the plaintiff, he contracted for both concerns and for the defendant, and he gave to the plaintiff a writing in the form of a receipt which contained the evidence of that contract. The defendant received this document from the Mint, and sent it to Anderson to be delivered to the plaintiff; and it was by him delivered to the plaintiff upon the surrender of the written contract of bailment. Both the defendant and Anderson, and all concerned, were therefore estopped from denying that the written statement thus delivered by them to the plaintiff was true in every word, letter and figure.

3. It was also admissible as part of the *res gestæ* to show the interpretation which the defendant and his principals placed upon their contract with the plaintiff. They gave it to him as evidence of performance, and it was therefore evidence of what that contract was—that is, to deposit the dust in the name of plaintiff.

III.   The third error assigned is, that the Court erred in refus-

ing to admit in evidence the entry from the weight book, or " deposit book," to prove by whom the money was deposited.

1. It does not follow because the evidence offered is a public record, that therefore it was admissible.   It must not only be competent testimony, but it must be pertinent ; and the evidence offered was not pertinent.   The defendant had himself already introduced and put in evidence the book of " gold warrants paid," in which, under a column headed " Rec'd of the U. S. Br. Mint the sums set opposite to our respective names, in full for Mint Recpts. numbered as in the margin," he had signed " G. H. Wines & Co., for Pat. Tuite."   He had therefore proved by his own unimpeachable testimony, by a public record, that he had received it for Patrick Tuite, the plaintiff.   It was therefore impertinent to inquire in whose name the original deposit was made.   It did not tend in any respect to prove any defense.

IV.    The fourth error assigned is, that " the Court erred in refusing to admit the receipt of Rhodes to prove the payment by Wines & Co."

We do not question the principle of law cited by the defendant, nor did the Court below reject the evidence on that ground.    We admit that the evidence was competent; but we insist that it was impertinent, and it was ruled out on that ground.    The receipt was offered to show that Wakelee paid the money to Rhodes.    We did not deny that the receipt was competent evidence to prove that fact, but we insisted that the defendant could not be permitted to prove that fact.    It was already in evidence that the money belonged to the plaintiff; that the defendant knew it belonged to the plaintiff; that he had received it as the plaintiff's money, and for the plaintiff : what right then had he to pay it to Rhodes or any one else ?    Rhodes had no authority to receive it for the plaintiff, and does not pretend to have, and did not receive it for the plaintiff.    He signs his receipt simply " Jesse Rhodes."

V.    Defendant had no authority from Wines & Co. to receive the money from the Mint.    His duty as agent was simply to fulfill the contracts of Wines & Co. as expressmen, to carry out the contracts made by them in that capacity.    The contract was to carry the dust to the Mint, and leave it there to be coined for account of

Patrick Tuite. When they had done that their contract was fulfilled, and Wines & Co. were discharged. They had no authority to take it back again. (*Adams & Co.* v. *Blankenstein*, 2 Cal. 413.) Taking the proceeds of the deposit out of the Mint was no part of the duty of Wines & Co. as common carriers—they were not employed by us to do that—and Wakelee had no authority from Wines & Co. to do this act in their name, and he did not bind them, and therefore he bound himself. (Story on Agency, secs. 264, 265 ; Addison on Contracts, 426, 427, 428.)

Defendant had notice to retain it, just as much as if the plaintiff had told him in express terms not to pay it over to Rhodes. He knew that the money belonged to the plaintiff, and that the plaintiff was at Weaverville ; he was privy to the whole transaction from the commencement. It did not come to him from Jesse Rhodes ; it came to him from the plaintiff. Rhodes & Whitney was only the carriage by which it came ; and when they ceased to be such a carriage, and the defendant ceased to connect with them as carriers, their whole relation was changed, and he had as good notice not to pay it over as if the plaintiff had notified him in express terms.

There is no pretense that the defendant paid the money over to his principals. Counsel assumes that receiving the money for Wines & Co. is in effect paying it to them ; because, being their agent, the moment it is in his hands it is in law in their hands. But in such cases the agent is himself liable as principal. (5 Phil. Ev. 118.) Paying to Rhodes was not paying it to Wines & Co., for Rhodes had no authority to receive for Wines & Co. Nor was it in discharge of any duty of Wines & Co., because, as I have before shown, Wines & Co. were not to pay the money to Rhodes. And this doctrine does not apply at all where the money is received tortiously. (Addison on Contracts, 426–428.)

COPE, J. delivered the opinion of the Court—FIELD, C. J. concurring.

We adhere to our former conclusion in this case. The evidence fails to disclose any authority on the part of either Wines & Co. or Rhodes & Co. to receive the money in question. It is clear, in fact, that no such authority existed, and that the engagement of

these parties terminated upon the gold being deposited at the Mint in San Francisco. The terms of this engagement were known to the defendant; and in withdrawing the proceeds, he must have been aware that he was acting outside of the scope of his employment as agent. Of course, he could do for his principals nothing which they could not do for themselves; and in assuming to act for them in a matter to which he knew their authority did not extend, he incurred a personal liability from which he had no power to relieve himself.

Judgment affirmed.